AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

FILED
CLERK, U.S. DISTRICT COURT

FEB 20 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| UNITED STATES OF AMERICA<br>v.<br>SALOUMEH RAHBARVAFAEI | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>19 MJ 00609 |
|---|---|

| Complaint for violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C) | | |
|---|---|---|
| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE SUZANNE H. SEGAL | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
| DATE OF OFFENSE<br>March 22, 2018 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about March 22, 2018, in Los Angeles County, within the Central District of California, defendant Saloumeh RAHBARVAFAEI, while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose, knowingly and intentionally distributed hydrocodone, a Schedule II narcotic drug controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>ROBERT R. THOMAS  /s/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | SUZANNE H. SEGAL | DATE<br>February 20, 2019 |
|---|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Benedetto L. Balding x2274          REC: Detention

## AFFIDAVIT

I, Robert R. Thomas, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.   I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, section 2510(7), who is empowered to conduct investigations of, and to make arrests for, drugs offenses enumerated in Title 18, United States Code section 2516.

2.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA"), and have been employed as such since November 2009.  I am currently assigned to the Los Angeles Field Division Southern California Drug Task Force, High Intensity Drug Trafficking Area ("SCDTF-HIDTA").  SCDTF-HIDTA is a task force comprised of agents and officers from federal, state, and local agencies, assigned to investigate large-scale drug trafficking.

3.   During the course of my employment with DEA, I have received several hundred hours of comprehensive, formal instruction on such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of drug traffickers' telecommunications devices, surveillance, and other investigative techniques. I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of drugs and other controlled substances, and conspiracies associated with drugs and

controlled substance offenses. I have been involved in drugs related arrests which resulted in the seizure of drugs and other evidence.

4.     During my training and through the course of my employment with DEA, I have used a variety of investigative techniques and resources, including, but not limited to, surveillance, confidential sources, undercover operations, telephone toll analysis, installation, monitoring and retrieval of electronic tracking devices on cars, and wire intercept communications analysis in Title III wiretap investigations.

5.     I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs, and the collection of money which represents the proceeds of drug trafficking and the laundering of such proceeds.

## II. PURPOSE OF AFFIDAVIT

6.     This affidavit is made in support of a criminal complaint and arrest warrant against Saloumeh RAHBARVAFAEI for the following offense: on or about March 22, 2018, in Los Angeles County, within the Central District of California, defendant Saloumeh RAHBARVAFAEI, while acting and intending to act outside the usual course of professional practice and without a legitimate medical purpose, knowingly and intentionally distributed hydrocodone, a Schedule II narcotic drug controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). RAHBARVAFAEI's conduct in unlawfully prescribing that drug is described in paragraph 14 below, and

2

the related medical expert findings are described in paragraph 22 below.

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  BACKGROUND REGARDING CONTROLLED DRUG DIVERSION

8.    Based on my training and experience, I know that the distribution of controlled substances including via prescription must be in compliance with certain federal rules and regulations, to include:

a.    21 U.S.C. § 812 establishes schedules for controlled substances that present a potential for abuse and likelihood that abuse of the drug could lead to physical or psychological dependence on that drug.  Such controlled substances are listed in Schedule I through Schedule V depending on the level of potential for abuse, the current medical use, and the level of possible physical dependence.  Controlled substance pharmaceuticals are listed as controlled substances, from Schedule II through V, because they are considered dangerous.  There are other drugs that are available only by prescription but are not classified as controlled substances.

3

Title 21 of the Code of Federal Regulations, Part 1308, provides further listings of scheduled drugs.

b.    Pursuant to 21 U.S.C. § 822, controlled substances may only be prescribed, dispensed or distributed by those persons who are registered with the Attorney General of the United States to do so (with some exceptions, such as delivery persons).  The authority to register persons has been delegated to the DEA by the Attorney General.  The authorization is commonly referred to as a "DEA registration number."

c.    21 C.F.R. § 1306.04 sets forth the requirements for a valid prescription.  It provides that for a "prescription for a controlled substance to be effective [it] must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." [emphasis added]

d.    The Chief of Drug Operations of the DEA Office of Diversion Control, Washington, D.C., has stated that acting within the course of professional practice "includes having an established doctor-patient relationship based upon a medical history, a physical exam and diagnosis."  Title 21, United States Code, Section 841(a)(1) makes it an offense for any person to knowingly or intentionally distribute or dispense a controlled substance except as authorized by law.

9.    Distribution of a scheduled controlled substance in violation of Title 21, United States Code, Section 841(a)(1) by

4

a medical doctor (often referred to as "diversion") occurs when a medical doctor knowingly or intentionally prescribes or dispenses a controlled substance, knowing the drugs were controlled, outside "the usual course of professional practice," namely, not for a legitimate medical purpose. See United States v. Moore, 423 U.S. 122, 124 (1975); see also United States v. Feingold, 454 F.3d 1001, 1008 (9th Cir. 2006) ("[T[o convict a practitioner under Section 841(a), the government must prove (1) that the practitioner distributed controlled substances, (2) that the distribution of those controlled substances was outside the usual course of professional practice and without a legitimate medical purpose, and (3) that the practitioner acted with intent to distribute the drugs and with intent to distribute them outside the course of professional practice.").

        a.    Oxycodone is a generic name for a narcotic analgesic classified under federal law as a Schedule II narcotic drug controlled substance.  It is commonly known by brand names such as Roxicodone, OxyContin, and Percocet.  Hydrocodone is a generic name for a narcotic analgesic classified under federal law as a Schedule II (formerly Schedule III) narcotic drug controlled substance.  Hydrocodone is also found in medications known by the brand names Vicodin, Norco, and Lortab.

        b.    Individuals on the black market — both drug addicts and drug traffickers — often seek to abuse or sell narcotics such as oxycodone and hydrocodone in combination with drugs including benzodiazepines, muscle relaxants, and/or stimulants.  Examples of benzodiazepines include alprazolam

5

(brand name Xanax), diazepam (brand name Valium), and clonazepam
(brand name Klonopin), each of which is a Schedule IV drug
intended primarily for use in treatment of conditions such as
anxiety or insomnia.  The primary muscle relaxant sought on the
black market is carisoprodol (Soma), also a Schedule IV drug
used for treatment of physiological conditions such as muscle
spasms.  Schedule II drug amphetamine salts (Adderall) are the
primary stimulant sought on the black market.  While each of
these drugs are addictive and dangerous even taken alone, the
combination of these drugs magnifies the danger of the overall
cocktail, and doctors prescribing and/or pharmacists dispensing
such cocktails is known among law enforcement to be a major red
flag of illicit diversion.

## IV. STATEMENT OF PROBABLE CAUSE

10.  The following is based on, among other things,
surveillances, public records queries, criminal history records,
controlled drug prescribing data from California's CURES
(Controlled Substance Utilization Review and Evaluation System)
database,[1] Medicare data, and my communications with prior case
agents in this investigation and with agents from the Department
of Health and Human Services – Office of the Inspector General
("HHS-OIG") and the Internal Revenue Service – Criminal
Investigation ("IRS-CI").

---

[1] CURES aggregates data of, among other things, all
prescriptions for controlled drugs at schedules II through IV
that are filled at pharmacies statewide, pursuant to state law
mandating that pharmacies accurately report such data.

11. Saloumeh RAHBARVAFAEI ("RAHBARVAFAEI") is a nurse
practitioner who is employed at locations including GOOD
NEIGHBOR CLINIC, located at 4300 Crenshaw Boulevard, Los Angeles
90008. As set forth below, investigators have purchased
controlled drug prescriptions from RAHBARVAFAEI during multiple
recorded undercover visits, and an independent medical expert
has found that RAHBARVAFAEI's prescribing was unlawful.
RAHBARVAFAEI has no criminal history or known professional
disciplinary history.

**A. Undercover Visits**

12. Over the course of the investigation, law enforcement
conducted undercover purchases of prescriptions from
RAHBARVAFAEI at GOOD NEIGHBOR CLINIC on five occasions. The
following are summary descriptions of the undercover operations,
based on recordings of the undercover visits and debriefings
with the respective undercover agents who conducted them.

1. February 22, 2018

13. On February 22, 2018, two undercover law enforcement
officers (UC-1 and UC-2) were sent in to the GOOD NEIGHBOR
CLINIC, where they separately met with RAHBARVAFAEI. Both UC-1
and UC-2 paid $500 cash for their appointments and were each
provided prescriptions for drugs including Tramadol, a Schedule
IV narcotic controlled substance. Neither UC-1 nor UC-2 were
physically examined by RAHBARVAFAEI, and RAHBARVAFAEI's meetings
with UC-1 and UC-2 lasted only a few minutes each.

2.   March 22, 2018

14.   On March 22, 2018, UC-1 went back to the GOOD NEIGHBOR
CLINIC to see RAHBARVAFAEI.  UC-1 paid $250 cash for the visit.
UC-1 provided a copy of an MRI bearing UC-1's alias to the
receptionist.  UC-1 was taken to an exam room where UC-1 was
soon met by RAHBARVAFAEI.  RAHBARVAFAEI asked how UC-1 was
doing; UC-1 responded that the medications (Tramadol) were not
working, but that UC-1 used his girlfriend's Norco (hydrocodone)
and it worked much better.  RAHBARVAFAEI discussed briefly the
MRI brought in by UC-1 (as noted below, described by a medical
expert as reflecting "trivial findings").  RAHBARVAFAEI
described the "protocol" for prescription of pain medication,
based on which she would prescribe Tylenol with Codeine, either
Tylenol 3 or Tylenol 4 (referring to two different formulations
of Tylenol with the narcotic codeine).  UC-1 stated that his
girlfriend was tired of UC-1 taking her Norco (hydrocodone).
UC-1 went on to state that UC-1 was not happy with having paid
$500 for the initial visit and $250 for this follow up visit and
not getting what he paid for.  RAHBARVAFAEI then agreed to
prescribe Norco (hydrocodone).  RAHBARVAFAEI asked UC-1 about
pain to which UC-1 stated there was none.  RAHBARVAFAEI then
stated that she would order blood work and that if UC-1 did the
blood work then she would continue to prescribe Norco
(hydrocodone).  UC-1 received a prescription for Norco
(hydrocodone), Flexural, and Naprosyn.  No physical examination
of UC-1 was conducted by RAHBARVAFAEI and the entire meeting
lasted less than seven minutes.

3.  April 19, 2018

15.  On April 19, 2018, UC-1 and UC-2 again met with
RAHBARVAFAEI at GOOD NEIGHBOR CLINIC, paying $250 cash each for
the office visits.  UC-1 was taken to an exam room where
RAHBARVAFAEI was already waiting.  UC-1 stated that the Norco
(hydrocodone) prescribed in the last visit was working well.
RAHBARVAFAEI referenced UC-1's records and asked if UC-1 takes
oxycodone.  UC-1 stated that UC-1 had run low on medication and
took one oxycodone.  RAHBARVAFAEI responded that doing so may
cause trouble for the clinic, including that "this is a DEA law,
and they are so hard on us right now."  RAHBARVAFAEI continued
that she has to "cut your medication... [to] show we are
concerned."  RAHBARVAFAEI requested UC-1 to provide a number
from zero to ten to rate UC-1's current level of pain.  UC-1
asked what RAHBARVAFAEI would consider a lot of pain, UC-1 asked
RAHBARVAFAEI "what you think, an eight?"  UC-1 was issued a
prescription for Norco (45 pills instead of the previous 60),
Flexeril, and Naprosyn.  UC-1 was advised by RAHBARVAFAEI that a
"good" urinalysis on UC-1's next visit would allow her to return
UC-1's prescriptions to "normal."  No examination of UC-1 was
conducted during this visit.

16.  UC-2 was taken to an exam room where RAHBARVAFAEI was
waiting.  UC-2 stated that the pain was not better and that the
medications were not helping.  RAHBARVAFAEI mentioned that UC-2's
urinalysis did not show the prescribed Tramadol but did show
opioids and oxycodone.  UC-2 stated that UC-2 had taken an
oxycodone from UC-2's mother. RAHBARVAFAEI stated that in order

9

to increase UC-2's pain medication she needed to see a "good" urinalysis. UC-2 received a prescription for Tramadol, Flexural, Mobic, and Lidoderm patches. No examination of UC-2 was conducted.

4. May 17, 2018

17. On May 17, 2018, UC-1 and UC-2 again visited RAHBARVAFAEI at the GOOD NEIGHBOR CLINIC. UC-1 and UC-2 each paid $250 cash for the office visit and provided the receptionist urinalyses requested by RAHBARVAFAEI on their previous visits. (The mocked urinalysis sample for UC-1 was positive for marijuana, hydrocodone, benzodiazepines, and flexural, even though UC-1 had not been prescribed benzodiazepines on the prior visit, while the mocked urinalysis sample for UC-2 was positive for Tramadol and flexural.) UC-1 was taken to a room already occupied by RAHBARVAFAEI. RAHBARVAFAEI briefly flipped through UC-1's medical record and immediately brought out her prescription pad. UC-1 asked if RAHBARVAFAEI could provide an additional 20 pills of Norco since she had reduced UC-1's prescription on the previous visit. RAHBARVAFAEI stated "that doesn't work like that" but nevertheless provided UC-1 a prescription for 60 pills of Norco (up from the prior prescription of 45 pills), Flexeril, and Naprosyn. No physical examination was conducted.

18. UC-2 was taken to an exam room where UC-2 was greeted by RAHBARVAFAEI. UC-2 informed RAHBARVAFAEI that the Tramadol was not helping with the pain. RAHBARVAFAEI asked if UC-2 had ever tried codeine, referring to Tylenol 3 or Tylenol 4 (i.e.,

10

two different drugs that contain the controlled narcotic
codeine). UC-2 stated that UC-2 had, but that Norco works
better. UC-2 stated that the Tramadol was like popping Advil,
and that codeine makes UC-2 feel intoxicated, but that there are
no side effects with Norco. RAHBARVAFAEI issued a prescription
for Norco (60 count), Flexural, and Naprosyn to UC-2. No
physical examination was conducted.

     5.   June 14, 2018

19. On June 14, 2018, UC-1 returned to the GOOD NEIGHBOR
CLINIC for another appointment with RAHBARVAFAEI, for which UC-1
paid $250 cash. UC-1 was taken to an exam room where
RAHBARVAFAEI was waiting. RAHBARVAFAEI asked if UC-1 was
experiencing any side effects from the medication to which UC-1
replied "No." RAHBARVAFAEI then asked UC-1, "do you need
everything?" as she took out her prescription pad. UC-1
confirmed that he did, and following which RAHBARVAFAEI provided
a prescription for Norco (60 count), Flexeril, and Naprosyn and
terminated the visit after only a few minutes of meeting with
UC-1. No physical examination was conducted.

    **B.**   **Expert review**

20. On December 9, 2018, Dr. Timothy Munzing conducted an
expert review of CURES data for RAHBARVAFAEI as well as review
of the video and reports generated from the undercover meetings

at the clinic, based on which Dr. Munzing produced a written
report dated December 9, 2018.[2]

21.  Dr. Munzing concluded that "based on the materials
reviewed, [RAHBARVAFAEI] has abandoned the practice of
legitimate medicine and has entered the practice of providing
access to dangerous controlled substance drugs to large numbers
of individuals for large monetary gain," and her "practice is
not even close to that of a 'usual professional practice.'"  Dr.
Munzing observed that his "findings have additional
confirmation" from the undercover recording showed "the context
of the practice," namely, undercover video showing that "[t]he
waiting room is typically full and overflowing with patients

_____

[2] Dr. Munzing received his medical degree from UCLA School
of Medicine in 1982.  He has served as a medical expert
consultant for the Medical Board of California since 2004 and as
a medical expert consultant for the DEA since 2014.  During that
time, Dr. Munzing has formally reviewed and provided opinions in
more than 100 cases, of which more than 70% have dealt in some
capacity with prescriptions of opioid and other controlled
medications.  Dr. Munzing has taught and/or lectured staff
physicians, students, and medical residents on guidelines and
appropriate practice in opioid prescribing.  Dr. Munzing has
nearly 30 years of clinical experience as a family physician
with the Southern California Permanente Medical Group (Kaiser
Permanente) in Santa Ana, California, during which time he
served as a physician leader responsible for reviewing the
quality of care given to patients and as a family medicine
residency program Director teaching medicine to thousands of
residents and medical students.  Dr. Munzing also holds an
appointment as a clinical professor at University of California
Irvine School of medicine.  Dr. Munzing is board certified in
family medicine and is a member of the American Pain Society and
the American Academy of Integrative Pain Medicine.  In its
summer 2017 issue, the peer-reviewed Permanente Journal
published an article authored by Dr. Munzing titled, "Physician
Guide to Appropriate Opioid Prescribing in Noncancer Pain."

seen for very short periods of time, and patients frequently are seen in [RAHBARVAFAEI]'s office, not an exam room."

22. Dr. Munzing also addressed CURES data for RAHBARVAFAEI for the period November 2016 to November 2018, which showed 4,707 total prescriptions to 630 patients. Dr. Munzing identified "concerning findings with red flags for potential abuse, misuse, [and] diversion." Dr. Munzing selected 10 patients for whom he had particular concerns based on "prescribing patterns identified," but he identified "many other patients" from the CURES data for whom he "ha[d] similar findings and could have been chosen." He concluded from the data that, "Though it is not possible to give a final conclusive opinion as to whether these medications were prescribed for a medically legitimate purpose in the usual course of professional practice (Title 21), based on the findings, and my extensive experience reviewing such cases, I find to a fairly high level of certainty that after review of the medical records, once obtained if they exist, that NP Rahbarvafaei failed to meet these requirements in prescribing these dangerous medications. These prescribing patterns are highly suspicious for medication abuse and/or diversion." Dr. Munzing's concerns over the CURES data included the frequency of "multiple dangerous prescriptions prescribed concurrently" and the volume of "patients receiving [controlled] medications [who] were in their 40's or younger."

23. The following is additional detail regarding Dr. Munzing's review of the March 22, 2018 undercover visit, which serves as the basis for the proposed complaint against

13

RAHBARVAFAEI. Dr. Munzing observed, among other things, that
RAHBARVAFAEI prescribed Norco (hydrocodone) even after UC-1
stated two times that he had been using his girlfriend's Norco
instead of the Tramadol that RAHBARVAFAEI previously prescribed.
RAHBARVAFAEI at first stated that "the protocol was for her to
prescribe Tylenol with codeine," but "UC#1 went on to say that
he was not happy paying $500 for the initial visit, and $250 for
the follow-up visits and not getting what he paid for. He said
that's a lot of money and I still must pay for the medications.
NP RAHBARVAFAELI (sic) then agreed that she would prescribe
Norco." Thereafter, RAHBARVAFAEI asked if "UC#1 had any pain in
the neck, back, or sciatica and he stated he did not." "At no
point during the visit was any examination of the patient done
by NP RAHBARVAFAELI (sic) or any other provider. The total time
with NP RAHBARVAFAELI (sic) was under seven minutes." While UC-
1 provided an MRI record to RAHBARVAFAEI during this visit, Dr.
Munzing reviewed a copy of the record and observed that it shows
"trivial findings." Dr. Munzing thus concluded that the
hydrocodone that RAHBARVAFAEI prescribed was not medically
justified and was outside the usual course of professional
practice.

//

//

//

14

## V.  CONCLUSION

24.  For all the reasons described above, I submit there is probable cause to believe that RAHBARVAFAEI has committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) (distribution of hydrocodone).

/S/

_____

Robert R. Thomas
Special Agent
Drug Enforcement
  Administration

Subscribed to and sworn before me
this _2o_ day of February, 2019.

_____

HON. SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

15